**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RACHEL HOHL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cv-00457** |
| | ) | **Judge Aleta A. Trauger** |
| **RELIABLE MICROSYSTEMS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Reliable Microsystems, LLC ("Rel-Micro") has filed a Motion for Summary Judgment (Doc. No. 26) under Federal Rule of Civil Procedure 56, seeking dismissal of the gender and disability discrimination claims asserted in the Complaint (Doc. No. 1) filed by Rachel Hohl. For the following reasons, the Motion will be granted in part and denied in part.

## I. BACKGROUND

### A. Rachel Hohl's Internship Leads to Full-Time Employment

Rel-Micro is a Tennessee-based limited liability company that provides engineering and technical design expertise to the federal government. Rachel Hohl is a Tennessee resident and former employee of Rel-Micro. In January 2022, Hohl began working at Rel-Micro as an engineering student intern while completing her undergraduate studies. (*Id.* ¶ 2; Doc. No. 29-1 at 28:7–8, 42:23–25.) Hohl excelled in her internship, which led Rel-Micro to offer her a permanent, full-time Junior Staff Engineer position after she earned her mechanical engineering degree. (Response to the Statement of Undisputed Material Facts ("RSUMF") ¶ 3.) Hohl accepted the offer. (*Id.*)

Lloyd Massengill and Julia Buckley offered Hohl the full-time position. (*Id.*) Massengill is Rel-Micro's founder, chief executive officer, and its "ultimate" decision-maker. (Doc. No. 29-

2 at 9:1–2, 59:1.) Buckley is Massengill's daughter and the company's chief operating officer. (RSUMF ¶ 6; Doc. Nos. 29-1 at 43:6–7; 29-3 at 93–94.) Hohl's offer letter stated that her starting annual salary was $75,000 and that she would report directly to Buckley. (Doc. No. 32-13 at 2.)

Hohl began her full-time position as a Junior Staff Engineer in August 2022. (RSUMF ¶ 4.) In this role, she was responsible for project management and drafting technical portions of government reports. (*Id.* ¶ 8.) She also assisted Rel-Micro with workforce recruitment and coached high school robotics clubs at two local high schools that the company supported. (*Id.*; Doc. No. 29-1 at 83, 115:22–25.) Hohl's recruiting and coaching duties were performed off-site and required regular remote work. (Doc. Nos. 29-1 at 121–122; 29-3 at 34.) By her own account, Hohl's duties were "so different than the other junior staff engineers"—all of whom were male. (Doc. No. 29-1 at 130:16–20.) Her educational credentials were also different than those of her male colleagues. She held a mechanical engineering degree, while the male engineers held electrical engineering and computer engineering degrees. (*Id.* at 83, 192.)

**B. Hohl's Debilitating Migraines**

Hohl has a documented medical history of severe chronic migraines. She was diagnosed with migraines as a child and has consulted with "neurologist after neurologist" over the last 20 years to treat her migraines. (Doc. No. 29-1 at 59:12–14, 61:23–25.) The migraines can be debilitating: they distort Hohl's vision, induce extreme nausea, and cause muscular pain in her head, neck, and shoulders. (*Id.* at 60:1–6, 19–25, 87:7–9.) They also impair Hohl's ability to physically move around, concentrate, and drive a vehicle. (*Id.* at 80:15–20.) Buckley and Jeff Kauppila both testified that they learned of Hohl's migraines in or around January 2023 and

possibly earlier.[1] (Doc. Nos. 29-3 at 28:15–17; 29-4 at 20–22.) However, Massengill testified several times that he never learned of Hohl's migraines at any point during her employment with Rel-Micro. (Doc. No. 29-2 at 22–23, 28.)

The severity of Hohl's migraines intensified towards the end of 2022 and into 2023. As her condition flared up, Hohl provided a detailed account of her condition in an email entitled "Health Update" that was sent to Massengill, Buckley, and Kauppila on February 2, 2023.[2] (RSUMF ¶ 44.) Hohl confided that she had been suffering from "terrible amounts of pain" since October 2022 due to her migraines. (*Id.*) Her migraines had "blurred" her vision and induced "debilitating nausea." (*Id.*)

Rel-Micro asserts that Hohl's performance and in-office attendance began to slip around this time. The company points to a couple of isolated, relatively minor instances of alleged underperformance by Hohl as her health was deteriorating. (Doc. Nos. 29-2 at 47:23–25–50:1–5; 29-4 at 68–69.) Rel-Micro takes primary issue with Hohl's decision to work remotely when she was suffering from migraines, claiming that her remote work conflicted with the company's in-office attendance policy (Doc. No. 29-3 at 36:16–25–37:1–3.) Hohl contends that she obtained prior approval from Buckley to work remotely when suffering from migraines. (Doc. No. 29-1 at 79:22–25–80:1–6, 121:20–25–122:1–24.) Buckley disputes that she ever granted prior approval. (Doc. No. 29-3 at 37:1–3.)

---

[1] Kauppila was Rel-Micro's chief technology officer throughout the relevant period. (RSUMF ¶ 7.) Although Hohl's offer letter specified that Buckley was her supervisor (Doc. No. 32-12 at 2), Massengill testified that Kauppila was Hohl's supervisor. (Doc. No. 29-2 at 39:9–10.)

[2] Neither party has attached Hohl's February 2, 2023 email as an exhibit to its summary judgment briefing, leaving the court with the job of trying to piece together the contents of this email based on what is factually undisputed in this case.

Hohl also failed to attend an "open house" at Rel-Micro's new office in Crane, Indiana on March 15 and 16 in 2023. (RSUMF ¶¶ 63, 66; Doc. No. 29-2 at 53:2–7—59:1–14.) Hohl explained to Kauppila beforehand that she had been stricken with an "ER-visit-worthy migraine" that made driving the 200-mile distance between Nashville and Crane impossible. (Doc. Nos. 29-1 at 194:20–21; 29-4 at 21:21–25–22:1–4.) Kauppila, who suffers from headaches that impair his driving, encouraged Hohl to stay home and prioritize her health because driving to Crane "could be dangerous" in her condition. (*Id*. at 21:21–25—22:1–4.) Kauppila then praised Hohl as a "valuable asset" and assured her that she had a promising future with the company. (Doc. No. 29-1 at 237:1–2.) Massengill saw it differently: Hohl's absence from the open house event was the "proverbial last straw," and "the situation" meriting consequences. (Doc. No. 29-2 at 58:1, 19–24.)

### C. Massengill Fires Hohl After She Elects to Use Short-Term Disability Leave Benefits.

After the Crane event, Hohl finally decided to prioritize her health and utilize the company's short-term disability benefits. On March 20, 2023, Hohl sent an email to Buckley and Kauppila with an email subject line that read "STD Request." (Doc. No. 32-10.) She confessed that she was "maxed out" and had "reached a point" where she could no longer "push through how bad" she felt. (*Id*. at 1.) Her migraines were interfering with her ability to "function at the level" that she expected of herself. (*Id*.) She was formally requesting disability leave to begin a new treatment plan for her migraines. (*Id*.) Hohl asked for a meeting with Buckley and Kauppila to discuss her leave request. (*Id*.) Buckley and Kauppila never responded. (Doc. No. 1 ¶ 21.)

Around the same time, Massengill emailed Hohl and scheduled a meeting for the morning of March 20—the same day that Hohl requested short-term disability leave.[3] (Doc. No. 29-2 at 62:6–12.) Massengill testified under oath that he terminated Hohl's employment during the March 20 meeting. (Doc. No. 29-2 at 63:10–20, 70:17–20.) When asked whether he ever rescinded that termination during the meeting, Massengill was adamant that he did not. (*Id.* at 70–71.) He further testified that he never told Hohl during this meeting that she could return to Rel-Micro as an employee after six weeks of short-term disability leave. (*Id.* at 70–72.) Massengill's sworn testimony is flatly contradicted by Hohl's audio recording of that meeting.[4] (Doc. No. 34.)

The audio recording of the March 20 meeting reflects that Massengill initially terminated Hohl's employment (*id.* at 5:38), but reversed himself and offered Hohl short-term leave so that she could address her deteriorating health: "Why don't you take a six-week leave? Get things in order. Come back after six weeks as a new person."[5] (*Id.* at 25:15–25:47.) Hohl's leave would be for "six weeks" and would be unpaid. (*Id.* at 25:52–27:10.) The leave would begin immediately and end on May 1, 2023. (*Id.* at 26:25–26:38, 28:38–28:50, 31:35–31:45.) It would "almost [be]

---

3 The March 20, 2023 email that Massengill sent has also not been attached as an exhibit to either party's briefing and thus the court cannot determine the date and time that it was received by Hohl.

4 The audio recording was manually filed with the court. (Doc. No. 34.) The audio recording is referred to as "Exhibit L" in Hohl's Response (Doc. No. 31) and in her Response to Rel-Micro's Statement of Undisputed Material Facts. (Doc. No. 32.) The court will cite to the audio recording as "Doc. No. 34" in this Memorandum for clarity. Hohl did not file a transcript of this recording. The court-supplied timestamps are approximations.

5 Rel-Micro does not dispute that the audio recording is a true and accurate recording of the meeting that took place between Massengill and Hohl on March 20, 2023. In fact, the company does not even acknowledge the recording in its summary judgment briefing (Doc. Nos. 26, 28, 35), which the court finds inexplicable. The company certainly knew (or should have known) about the existence of this key piece of evidence. Hohl repeatedly testified about the recording during her deposition on April 30, 2026, and Massengill was not deposed until June 9, 2026.

like leaving and coming back and starting over again" and would provide time for Hohl to get her "health under control." (*Id*. at 25:52–27:10.) Massengill insisted that their conversation be kept secret and that Hohl only speak with him and "no one else." (*Id*. at 27:20–27:40.)

The audio recording also contradicts Massengill's sworn testimony about whether he agreed that Hohl could keep her health insurance during her six weeks of leave. Massengill testified—again and again—that he never agreed that Hohl could keep her health insurance during her leave. (*Id*. at 63–64, 70–75, 80:3–11.) The recording tells a completely different story. Contrary to Massengill's deposition testimony, the recording confirms that Hohl asked Massengill if she could keep her company health insurance benefits during her medical leave because she had already hit her out-of-pocket maximum. (Doc. No. 34 at 30:50–31:17.) Massengill's response was unambiguous: "OK, I'll let you keep your insurance." (*Id*. at 31:00–31:17.)

On March 20, 2023, Hohl started her short-term disability leave. On April 4, 2023, Hohl unexpectedly received an email from Massengill with a subject line that read "Exit Information." (RSUMF ¶ 74.) In the email, Massengill terminated Hohl's employment with Rel-Micro. (*Id*.) Massengill also reneged on his commitment that Hohl could keep her health insurance and directed Buckley to cancel Hohl's company health insurance policy. (*Id*. ¶ 73.) Hohl now faces $45,000 in medical debt for her ongoing migraine-related treatment, which is currently in collection. (Doc. No. 29-1 at 228:23–25—229:1–4.)

## II. PROCEDURAL HISTORY

In April 2025, Hohl initiated this action. (Doc. No. 1.) She asserts two claims against Rel-Micro. Count 1 is a claim for gender discrimination under Title VII of the Civil Rights Act of 1964. (*Id*. ¶¶ 29–32.) Count 2 is a claim for disability discrimination under the Americans with Disabilities Act of 1990 ("ADA"). (*Id*. ¶¶ 33–36.) The latter claim, however, has two components. The first component rests on Rel-Micro's termination of Hohl's employment. (*Id*. ¶ 34.) Hohl

alleges that she was terminated due to her migraines, which she claims is a disability under the ADA. (*Id*. ¶¶ 13, 15, 34.) The second component rests on Rel-Micro's purported failure to provide a reasonable accommodation to Hohl. (Doc. Nos. 1 ¶¶ 27(a), 34–36.) Rel-Micro filed an Answer denying the material allegations in the Complaint. (Doc. No. 13.)

In July 2026, Rel-Micro filed a Motion for Summary Judgment (Doc. No. 26), which was accompanied by a Statement of Undisputed Material Facts (Doc. No. 27), a supporting Memorandum of Law (Doc. No. 28), and various deposition transcripts. (Doc. Nos. 29-1 through 29-4.) Hohl filed a Response in Opposition to Rel-Micro's Motion for Summary Judgment (Doc. No. 31), a Response to Rel-Micro's Statement of Undisputed Material Facts (RSUMF), and various exhibits. (Doc. Nos. 32-1 through 32-23.) Rel-Micro filed a Reply in support of its motion. (Doc. No. 35.)

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can meet this burden by identifying and citing specific portions of the record—including "depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—which establish the absence of a genuine dispute over material facts.[6] Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). If the moving party meets its burden, the burden shifts to the non-moving party to provide evidence beyond the pleadings showing a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). In evaluating the evidence, the court assumes that the evidence of the non-moving party is true and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255.

At the summary judgment stage, the court cannot "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Nevertheless, the "mere existence of a scintilla of evidence in support of the" non-moving party is not sufficient to avoid summary judgment. *Id.* at 252. "There must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" non-moving party is entitled to a verdict. *Id.*

---

[6] Contrary to Rel-Micro's incorrect statement of law (Doc. No. 28 at 5), the court may consider hearsay statements at the summary judgment stage, so long as the hearsay statements can be offered in an admissible form at trial. *Wyatt v. N. Am., Inc.*, 999 F.3d 400, 423, 424 n.8 (6th Cir. 2021). Multiple provisions of Rule 56(c) make this clear. For example, Rule 56(c)(1)(A) contemplates that parties at the summary judgment stage will cite to "particular parts of materials in the record, including *depositions*, *documents, electronically stored information*, *affidavits* or *declarations*"—record sources that undoubtedly contain hearsay. Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Rule 56(c)(2) also recognizes that hearsay statements can be considered because that rule provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented *in a form that would be admissible in evidence*." Fed. R. Civ. P. 56(c)(2). This is all to say that a non-moving party who bears the burden of proof at trial need not produce at the summary judgment stage evidence in a form that would be admissible at trial in order to avoid summary judgment. *J.H. by Harris v. Williamson Cnty.*, No. 3-14-2356, 2018 WL 10150480, at *1 (M.D. Tenn. July 5, 2018).

## IV. DISCUSSION

### A. Hohl's Gender Discrimination Claim

Title VII makes it unlawful for an employer to discriminate against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of" her sex. 42 U.S.C. § 2000e-2(a)(1). When, as here, a claim of sex discrimination relies on circumstantial evidence, courts use the familiar three-step burden-shifting framework first articulated in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03 (1973). To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019).

To establish a *prima facie* case of gender discrimination, the plaintiff must prove that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Id*. at 606–07. Here, the parties only dispute whether Hohl has satisfied the fourth element for establishing a *prima facie* case—*i.e.*, whether she was treated differently than similarly situated male employees. (Doc. Nos. 28 at 15; 31 at 16.) As detailed below, the court will dismiss Hohl's gender discrimination claim because she has not established that she was treated differently than similarly situated male employees.

Hohl's gender discrimination claim rests on allegations that she was treated differently than the three male Junior Staff Engineers employed by Rel-Micro. (Doc. No. 31 at 17.) She specifically claims that the three male engineers "were sent directly into technical work and trained on Rel-Micro's two [Technology Computer Data Design] licenses," while Hohl was assigned "almost exclusively to non-technical duties under Buckley's supervision." (*Id*. at 17.) Hohl also claims that the male engineers received higher levels of compensation. (*Id*. at 20–23.)

Two of the male engineers received starting salaries that were a few thousand dollars more than Hohl. (*Id*. at 21–22.) Two of the male engineers also received signing bonuses of $5,000 and $10,000, respectively—bonuses that Hohl did not receive. (*Id*. at 21.) One male engineer—who was employed around the same time as Hohl and received a lower starting salary than she did—received a salary increase in his first year of employment. (*Id*.) Hohl did not receive a salary increase in her seven months of full-time employment with the company.

Rel-Micro asserts that Hohl's gender discrimination claim fails because she cannot "identify a similarly situated employee who is comparable to her in all relevant respects." (Doc. No. 28 at 16–17.) The court agrees. The record shows that the three male engineers that Hohl offers up as comparators to establish disparate treatment were not similarly situated to Hohl. She testified during her deposition that her "role was so different than the other junior staff engineers" and that she had a "myriad of different responsibilities" compared with the male engineers. (Doc. No. 29-1 at 45:17, 83:13–21, 130:16–20.) Hohl even conceded that she "did not have th[e] job that is technically the . . . junior staff engineer, as those three other junior staff engineers [who were male]." (*Id*. at 84:10–13.) Hohl's role was not similar to the role occupied by the male engineers, a fact fatal to her gender discrimination claim.

Hohl also acknowledged that her professional skills and educational credentials were different than those of the three male engineers she proposes as comparators. She testified that "the degrees I have are not the same as the electrical engineering or computer engineering [degrees] of my male colleagues." (*Id*. at 192:10–13; *see also id*. at 185:18–19 (Hohl testifying that her "skills" were different than those of her "male coworkers"). The record also reveals that at least one of the male Junior Staff Engineers possessed two years of prior engineering experience, while Hohl had no prior professional engineering experience, as she had just graduated from college. (Doc. No. 28

at 17.) Based on this record, the court finds that the three male Junior Staff Engineers were not "similarly situated" employees to Hohl, given the acknowledged differences in "responsibilities, experience, and work record" at the time. *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 548–49 (6th Cir. 2006) (comparators proposed by the plaintiff were not "similarly situated" when the proposed comparators had "different levels of experience" than the plaintiff "at the relevant time").

A male candidate who was offered an engineering internship position with the company also is not "similarly situated" to Hohl for purposes of her gender discrimination claim. Hohl asserts that a male candidate offered an engineering internship in November 2022 was offered higher intern pay than what Hohl received as an intern. (*Id*. at 20; RSUMF ¶ 84.) As an initial matter, the record is not clear that the male intern candidate even accepted the internship offer—an offer that was made a year *after* Hohl was hired as an intern and *months after* she became a permanent, full-time employee. (Doc. No. 32-21 at 3.) Further, to the extent he was actually employed by the company as an intern, Hohl does not produce any facts that would support an inference that she is similarly situated to this individual (*i.e.*, similar job duties, work experience, educational background), beyond the observation that he was an engineering intern candidate. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (the plaintiff bears the burden in showing "that the 'comparables' are similarly-situated *in all respects*." (emphasis in the original)). The court therefore finds that Hohl has failed to establish that the intern candidate was similarly situated in all relevant respects.

In sum, the court finds that the proposed comparators were not similarly situated to Hohl. Because Hohl has not identified any similarly situated employee who was treated differently than her, the court concludes that Hohl fails to establish a *prima facie* case for gender discrimination.

There is therefore no need to proceed further with the *McDonnell Douglas* burden-shifting analysis as to Hohl's gender discrimination claim. *Gregory v. NIC Glob.*, No. 2:13-cv-0016, 2014 WL 2919154, at *5 (M.D. Tenn. June 27, 2014) (Sharp, J.) (dismissing age and gender discrimination claims when the plaintiff failed to carry initial burden in establishing a *prima facie* case of discrimination). Rel-Micro's Motion for Summary Judgment will be granted as to Hohl's gender discrimination claim, and Count 1 of the Complaint will be dismissed.[7]

**B. Hohl's Disability Discrimination Claim**

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). In the absence of direct evidence of disability discrimination, courts use the *McDonnell Douglas* burden-shifting framework when considering discrimination claims under the ADA. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). The court will deny the portion of Rel-Micro's Motion seeking dismissal of Hohl's disability discrimination claim. (Doc. No. 28 at 5–12.)

The *McDonnell Douglas* framework consists of three steps. As discussed above, the first step requires the plaintiff to establish a *prima facie* case of discrimination. To establish a *prima facie* case, the plaintiff must show that (1) she has a disability; (2) she is otherwise qualified for the position despite her disability, with or without a reasonable accommodation; (3) her employer knew or had reason to know of her disability; (4) she suffered an adverse employment action; and

[7] Hohl asserts in her Response that she asserted a claim for wage discrimination against Rel-Micro under the Equal Pay Act of 1963 ("EPA"). (Doc. No. 31 at 24–25.) Hohl never asserted such a claim in her Complaint. (Doc. No. 1.) Nor has she sought to amend her pleading to add a wage discrimination claim under the EPA. So, the court will not address this hypothetical claim. In any event, claims for gender discrimination under Title VII and claims for wage discrimination under the EPA "often rise and fall together, at least where they are based on the same set of facts." *Beny v. Univ. of Mich.*, No. 24-1674, 2025 WL 2124175, at *10 (6th Cir. July 29, 2025), *cert. denied,* 146 S. Ct. 829 (2025).

(5) there was a causal connection between the disability and the adverse action. *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 767 (6th Cir. 2025). Rel-Micro argues that Hohl cannot establish the first, second, and fifth elements of her *prima facie* case. (Doc. No. 28 at 6–10.) The court finds that Hohl has met her initial burden as to the three disputed elements, as detailed below.

Hohl has established the first element. A physical or mental impairment qualifies as a "disability" under the ADA if the condition substantially limits one or more major life activities. *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 371 (6th Cir. 1997) (citing 42 U.S.C. § 12102(1)(A)). The evidentiary record reflects that Hohl's chronic migraines constitute a legally cognizable disability under the ADA. Hohl has suffered from severe chronic migraines since childhood. (Doc. No. 29-1 at 59:12–14, 61:23–25.) Hohl's migraines limit her vision, concentration, and ability to work. (*Id*. at 60:1–6, 19–25, 80:15–20, 87:7–9.) These uncontroverted allegations are enough to establish that Hohl's condition constitutes a "disability" under the ADA. *See Edwards v. Shelby Cnty.*, 159 F.4th 489, 501 (6th Cir. 2025) (recognizing that vision is "a major life activity that the ADA expressly recognizes." (citing 42 U.S.C. § 12102(2)(A))); *Monce v. Marshall Cnty. Bd. of Educ.*, 307 F. Supp. 3d 805, 815 (M.D. Tenn. 2018) (Crenshaw, J.) (the "ability to work" and "concentrate" are major life activities under the ADA).

Hohl also meets the second element because the evidence supports the inference that Hohl was qualified to perform the essential functions of her position, despite her disability. Rel-Micro argues that Hohl cannot establish that she was qualified because the company "considered regular, on-site attendance an essential function of Plaintiff's engineering position" and "did not permit remote work." (Doc. No. 28 at 8.) The record, however, is far less clear about whether (1) Rel-Micro's policies allowed remote work; or (2) Hohl had permission from Buckley to work remotely on her migraine days.

For example, Rel-Micro's offer letter extending a full-time position to Hohl did not identify any on-site attendance requirement. (Doc. No. 32-13 at 2.) Rather, the letter stated that "[w]ork hours will be flexible." (*Id.*) Likewise, Massengill—the company's founder and its "ultimate" decision-maker (Doc. No. 29-2 at 59:1)—testified that Rel-Micro's policies regarding flexible work arrangements were not nearly as inflexible as the company now claims in this litigation. Massengill described the company's policy as "ad-hoc" that could be modified between an employee and her supervisor "under extenuating circumstances." (*Id*. at 35–36.) He even disclosed that the company had previously allowed an employee in a similar position as Hohl to work remotely. (*Id*. at 27–28.) Further, the court is skeptical that remote work was not permitted because the record also establishes that Hohl was *required* to work remotely to perform some of her duties. (Doc. Nos. 29-1 at 121–22 (Hohl testifying that she was "on the road hitting school after school" to perform her recruiting activities for the company); 29-3 at 34 (Buckley testifying that Hohl worked "remotely" when "assisting with the robotics clubs.").) This evidence supports the inference that remote work was not only permitted but regularly utilized by employees, including Hohl.

There is also evidence in the record supporting the inference that Hohl had permission to work remotely on days when she was suffering from migraines. *Boltz v. United Process Controls*, No. 1:16-cv-703, 2017 WL 2153921, at *9 (S.D. Ohio May 17, 2017) (concluding that evidence that an employee was permitted to work remotely in the past "precludes summary judgment on the issues of whether regular and predictable on-site attendance was an essential function" of the employee's position). Hohl contends that Buckley gave prior approval to work from home on an as-needed basis. (RSUMF ¶ 13; Doc. No. 29-1 at 79–80, 121–122.) Buckley denies ever giving such approval. (Doc. No. 29-3 at 37:1–3.) The court cannot reconcile this conflicting testimony

without making credibility determinations about the witnesses and their testimony. *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999) ("Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment; rather, the evidence should be viewed in the light most favorable to the non-moving party."). In short, the evidence viewed in the light most favorable to Hohl establishes that she was able to perform the essential functions of her job despite her disability.

Finally, the court finds that Hohl has demonstrated a causal connection at this stage between her disability and the termination of her employment and thus satisfies the fifth element of her *prima facie* case. Rel-Micro claims that Hohl "cannot establish the requisite causal connection" because the company decided to terminate her for non-discriminatory reasons before she submitted her leave request. (Doc. Nos. 28 at 9–10; 35 at 4.) That glossy assertion is at best misleading. The record shows that Hohl was terminated only 15 days *after* she requested short-term disability leave. This is evidenced by Hohl's March 20 email requesting short-term disability leave (Doc. No. 32-10), the audio recording from March 20 in which Massengill clearly states that Hohl could take short-term disability leave for six weeks and keep her health insurance (Doc. No. 34), and the subsequent termination of Hohl's employment via email on April 4 while on leave. (RSUMF ¶ 74.) The close temporal proximity between her leave request and termination is enough to create a presumption of causality. *DiCarlo v. Potter,* 358 F.3d 408, 417 (6th Cir. 2004) (three weeks between employee's protected activity and termination constituted sufficient temporal proximity to raise an inference of causality); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (two-month lapse between the protected activity and the adverse employment action established a causal connection).

In sum, the court finds that Hohl has succeeded in establishing a *prima facie* case for disability discrimination. The court will therefore proceed to the second step of the *McDonnell-Douglas* framework.

At the second step, a defendant moving for summary judgment on a discrimination claim bears the burden of production to show a legitimate and non-discriminatory reason for its challenged action. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020). Rel-Micro has met its burden of production because it has articulated that Hohl was terminated for nonattendance and performance-based reasons. (Doc. No. 28 at 10–12.) Those are legitimate, non-discriminatory reasons justifying termination. The court will therefore proceed to the third and final step of the three-part burden-shifting test.

At the third step, the plaintiff bears the burden "to demonstrate that the proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981). The plaintiff can meet this burden and "rebut the proffered reason by producing evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (quotation marks omitted). Pretext can be established by evidence that the employer's proffered reason (1) had no basis in fact; (2) did not actually motivate the employer; or (3) was insufficient to warrant the adverse employment action. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014).

There is enough evidence for a reasonable jury to find that Rel-Micro's proffered reasons for terminating Hohl were false and a pretext for unlawful disability discrimination. This evidence includes documents and testimony casting doubt on whether Hohl's periodic remote work even violated the company's policies. (Doc. No. 29-2 at 27–28, 35–36; Doc. No. 29-1 at 79–80, 121–

122; Doc. No. 32-13 at 2.) There is also undisputed evidence that Hohl's absence from the open house event in Crane—"the situation" leading to her termination, as Massengill recounted (Doc. No. 29-2 at 58:1, 19–24)—was approved (and even encouraged) by Kauppila, given her "ER-visit-worthy migraine." (Doc. No. 29-4 at 21–22.) Finally, the court is mindful of the timing of Hohl's termination, which occurred only 15 days after she submitted her request and while she was on leave. Rel-Micro does not even acknowledge the timing of Hohl's termination. This suspicious timing, when considered alongside the other evidence (described above) that raises doubts about the veracity of Rel-Micro's stated reasons for termination, creates a powerful inference of pretext. *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393 (6th Cir. 2005) (close temporal proximity between protected activity and adverse employment action "is a strong indicator of pretext when accompanied by some other, independent evidence.").

The court also rejects Rel-Micro's resort to the honest-belief doctrine in its defense. The honest-belief doctrine protects employers only when they make "reasonably informed and considered" decisions "before taking an adverse employment action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). But the evidence viewed in the light most favorable to Hohl suggests that Rel-Micro's decision was neither "reasonably informed" nor "considered." Significantly, the company's management is not consistent as to when they terminated Hohl, or as to the specific reason justifying her discharge. (Doc. No. 31 at 15–16.) Those facts alone belie any claim of an informed, considered process. Besides, the close temporal proximity between Hohl's leave request and her termination, as well as the significant inconsistencies surrounding Massengill's deposition testimony, are sufficient to deny the request to dismiss this claim based on the honest-belief doctrine.

The portion of Hohl's disability discrimination claim alleging a failure to accommodate will also not be dismissed. The company asserts, in a footnote, that Hohl failed to properly plead her failure-to-accommodate claim because it was not listed as a standalone count in her Complaint. (Doc. No. 28 at 8 n.1.) This argument fails for at least two reasons. First, this argument was not developed in any substantive way in the Motion. Instead, the argument was "relegated to a footnote" and is therefore deemed "waived." *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 469, 474 (M.D. Tenn. 2023). Second, Rel-Micro acknowledges elsewhere in its Motion that Hohl's disability discrimination claim does allege that the company "failed to accommodate her alleged disability." (Doc. No. 28 at 4.) The company cannot seriously claim that it lacked notice of this component of Hohl's disability discrimination claim. The court therefore declines to dismiss Hohl's disability discrimination claim based on purported pleading deficiencies.

## V. CONCLUSION

For the reasons stated herein, the Motion for Summary Judgment (Doc. No. 26) will be granted in part and denied in part. The court grants the Motion as to Hohl's gender discrimination claim, and Count 1 in the Complaint will be dismissed. The Motion will be denied as to the disability discrimination claim asserted in Count 2.

An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge